Baker *v.* DeRosa, Appellant.

Argued November 20, 1963. Before Bell, C. J., Musmanno, Jones, Cohen, O'Brien and Roberts, JJ.

*Joseph Head,* with him *Swartz, Campbell & Henry,* for appellant.

*Sidney B. Klovsky,* with him *Paul N. Minkoff,* and *Klovsky and Kuby,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 8, 1964:

On October 4, 1958, Jerome A. Baker's automobile, with him in it, was struck in the rear by the car of Biagio DeRosa. On December 11, 1958, he died. Verna Baker, administratrix of his estate, brought suit against DeRosa, claiming that her husband's death was caused by the injuries he received when the cars collided, the injuries having brought about or aggravated a bronchogenic malignant condition. The jury returned a verdict in the sum of $10,000 and the defendant seeks a new trial, alleging failure of proof in the plaintiff's case, plus alleged trial error.

The defendant contends that Baker died of a cancerous condition in no way related to the accident of October 4, 1958. Two doctors called by the defendant so testified. Since the jury found for the plaintiff, the appellant admits that there would be no purpose in discussing the defendant's doctors' testimony.

The decedent's family physician, Dr. Broocker, testified that Baker was in good physical condition prior to the accident, that he had visited him on August 25, 1958, for a "check-up" and the examination showed him to be in "good health."

Dr. Broocker called at the home of Baker on October 6, 1958, and the patient related that he had been in an automobile accident, that his car had been struck violently from the rear and he had been thrown against the steering wheel, that his head snapped back and forth, he felt a wrenching, and he "saw stars." The doctor testified that his examination on October 6th revealed: "contusions of the chest wall, discoloration here (indicating), muscle spasm of the neck and low back, recorded here as cervical and lumbar areas. I recorded a blood pressure of 142-90, and I diagnosed a post-concussion syndrome."

The decedent worked several days following the accident and then was confined to bed for several days. On October 18th he returned to work and continued at his job until November 8th when he became bedfast. He remained at home for three weeks and was then taken to the Veterans' Hospital on November 27th. His condition worsened and he died on December 11, 1958. He was then 62 years of age. When Dr. Broocker was asked what, in his medical opinion, was the cause of death, he replied: "At the time I thought it was as a result of the accident."

He was questioned further: "Q. What is your opinion? A. I felt that the violent effect of being thrust into the steering wheel, that the violent effect of the chest being struck hard against the steering wheel set into motion whatever occurred. I mean, the fact that the man was in good health reasonably close to the time of the accident and then became sick immediately after the accident, my opinion is that the accident caused the circumstances that I found. By Mr. Klovsky: Q. Later on you learned and were advised, and from your own observation of what you saw, that there was a diagnosis of bronchogenic carcinoma, is that correct? A. Yes. Q. Based upon everything that you saw, based upon your observation of the patient, do you have an opinion as to whether this bronchogenic carcinoma was in any way aggravated, actuated, or precipitated by the accident of October 4, 1958? . . . A. My opinion is that the accident aggravated this carcinoma, causing the premature death of this man. Q. What is the basis of your opinion? A. The fact that the man was in good health immediately prior to the accident, became sick immediately after, and his course was steadily downward until he passed on. He coughed up blood right after the accident. If there had been something in his chest prior to that time, it was certainly stirred up very violently by the accident."

Dr. N. H. Moss, who had specialized in cancer studies, testified: ". . . the rapidity of his demise from the time of admission to the hospital to the time he died, which was essentially November 27 to December 11, this obviously is a very rapid course in the hospital. But that is not the significant thing. The significant thing is the development of his symptoms from the time of the accident to the time of his demise. This itself is a very rapid course for this disease. When we study large numbers of cases of cancer of the lung, this is an exceptional rapid course for this man's disease. From the time he developed this symptomatology and under those circumstances, it would reaffirm or add to the evidence that there was this contributing, aggravating and perhaps even precipitating factor of trauma that added to his rapid downhill course."

He said further: ". . . I believe that the impact of trauma was a significant and a substantial factor that accelerated and aggravated and perhaps precipitated the rapid downhill course of this patient. But I would not wish to have stated that this in any way actually caused his death, because the cancer was what caused his death. The trauma itself speeded up or activated or accelerated the actual malignant process."

The defendant attacks Dr. Moss's conclusions because at one point in the cross-examination he said: "We are not dealing in the area of certainty. Therefore, we have to think in terms of probability."

But it is particularly to be noted in what manner he employed the word "probability". He explained: "When you have proof of something, you have a hundred per cent. But if you take a rifle, as I started to say, and you aim at a target and you hit it ninety-nine out of a hundred times, you don't have the proof. You only missed it by one; nevertheless, this is probability. That is what I'm talking about."

In view of this explanation, it can hardly be said that the doctor's phrase, "likely probability" takes his opinion into the area of an unreliable conclusion. A marksman who can hit the bulls-eye 99 times out of 100, could, with some semblance of accuracy of language, be referred to as a dead shot.

The question as to whether the injury sustained by the decedent on October 4, 1958, was the proximate cause of his death, through the activation of cancer or acceleration of an existing one, was strictly a question of fact for the jury and it was so properly submitted to the jury by the trial judge.

At the time of the oral argument before this Court, the appellant's counsel contended vigorously that there is no scientific support for the proposition that trauma can cause or worsen a latent cancer. But this was counsel's own personal view based on what the defendant's doctors stated, which, as we have seen, was not accepted by the jury.

Defendant's counsel attacks the credibility of Dr. Broocker on several points, none of which seems very weighty. He calls attention to a card kept by the doctor in his office and on which he recorded visits made by the decedent, as well as other pertinent data. It appears that Baker first visited Dr. Broocker on March 6, 1949, at which time the doctor made up the record card which he kept ever since, entering appropriate data from time to time. The doctor wrote on the card, "Su 9-5957" as the decedent's telephone number. Employees of the telephone company testified that that number was not used by the telephone company until one year subsequent to March 6, 1949. The appellant argues for the inference that the card was manufactured evidence and that, in pre-dating March 6, 1949 the doctor made the error of writing a number which he could not have known until later. This is tenuous logic. There are many explanations for an error in re-

cording a telephone number which exclude intended fabrication. As the lower court said: "The card in question was in use by Dr. Broocker for a period of more than nine years. During that period, the telephone number listed on the card was in fact the deceased's number from 1950 on, or eight of the nine years during which the witness made entries upon it for his own record and reference."

The number could easily have been added after March 15, 1950, when Su 9-5957 *did* become the decedent's correct number. Defendant's counsel did not ask at the trial any question to exclude this natural explanation. All that defendant's counsel asked was: "And I presume that you made up the card on March 6, 1949?" The doctor answered "Yes," but he did not say that he entered the telephone number on March 6, 1949. Nor did appellant's counsel ask him when the number was entered.

The appellant argues further that the notes appear on the doctor's card are incomplete and sketchy. The lower court answered this argument satisfactorily, when it said: ". . . There is nothing abnormal, as suggested by the defendant, about the way in which they are written. They record a history of treatment over a number of years leading up to and following the accident involved in this case. . . .

". . . We deem this to be a very insignificant matter and one which does not require any discussion to realize that a physician's summary report may not include mention of every visit or of every treatment rendered by the physician. Furthermore, the witness was cross-examined on this point and his explanation was entirely credible and satisfactory. Moreover, the matter was submitted to the jury for their consideration as to weight and credibility."

A more serious matter is raised by the appellant when attention is called to the fact that in a report

made up by the decedent after the accident he answered, "No" to the question: "Were you injured?" The evidence on this feature of the case is not clean-cut, clear or convincing for one side or the other. The claim made by the decedent on the form in question was one apparently aimed primarily at property damage. Since emphasis was on the damaged car, the last item on the form read: "I have traded car in for a new one you can see car at Bertolete 700 Garrett Rd. Upper Darby."

The form was not signed by the decedent, nor did he write in any answer to the query: "Does the foregoing information constitute the entire claim resulting from this accident?"

The date appearing on the form is "9-6-58." September 6th is obviously incorrect because it is admitted by everyone that the accident happened on *October* 4, 1958. The mistake made by the decedent in this regard is one of the most common chronological errata of mankind. Whether the explanation is that man only reluctantly gives up the passing of time and subconsciously likes to hold on to it by still using the previous month's or year's date, or whether habit is often stronger than consciousness, and thus a frequently repeated month or year continues to be repeated, cannot be said with certainty, but it is rather self-evident that although one may err as to month or year, he invariably uses the correct day. This explanation is made here because appellant's counsel argues that the decedent's claim sheet was actually written out on October 9th. He reasons in this manner: The decedent wrote out, as indicated above, that he traded in his car for a new one. Counsel asked Mrs. Baker: "Isn't it a fact that your husband traded the car involved in the accident in on the Wednesday following the accident?" And she answered: "That's right." This would have made the transfer date October 8th, but, in a procrustean at-

tempt to lengthen the time to fit defendant's theory, counsel argues that Baker could not have made out the claim until October *9th.* Why the 9th? The fact of the matter is that there is nothing in the record to exclude the reasonable explanation that what the decedent was referring to on October 6th was that he had made *arrangements* to have his car traded in, but that the physical trade did not occur until, as the wife stated, on October 8th.

The realities easily add up to the conclusion that the claim was made, as the decedent stated, on the 6th, thus only two days after the accident and not 5 days as argued for by the claimant. This brings us back to the question as to why the decedent said on the 6th (not the 9th) that he had not been injured.

His wife explained that when he made out the report "he did not think he was injured." This coincides with the realism of the situation. On the 6th Baker went to work and apparently sometime during the day filled out the controverted claim. That evening, however, when he returned home he was ill. His wife testified to seeing dark spots across his chest and that he was expectorating blood. She called the doctor and he came that *evening.*

The medical books would undergo considerable thinning if there were removed from them all the cases of persons who were hurt but did not realize the full extent of their injuries at the time of the untoward happening, the disabling symptoms having been delayed because of the rugged constitution of the patient or because of the naturally retarding effect of the disabling agent. The jury was warranted in finding, from the facts, and the natural rationalization from the facts, that Baker sustained violence to his chest on the 4th but that it was not until the evening of the 6th that he realized he had been seriously injured.

The appellant finally complains that the charge of the trial court was prejudicial to the defendant. Appellant's brief states: "The flavor of the charge can only be appreciated upon a careful reading of the entire charge, and we respectfully request that such be done." That has been done and the Court fails to find in it the flavor which apparently was a sour one to the defendant. It is in the very nature of things that opposing counsel savor in the judge's charge conflicting tastes. Attorneys nearly always see in a Court's charge a leaning to the opposite side while it is being delivered, and if the verdict comes in for the opposite side, the losing counsel is now certain that the leaning tower fell into the enemy's territory. That general feeling is perhaps specific in this case. Appellant's counsel says that the trial court failed to charge properly on the essential matter of burden of proof. The trial judge not only once, but several times impressed upon the jury the proposition that the plaintiff had the burden of proof to establish her case by the weight of the evidence. Obviously if she did not sustain that burden, she could not recover. The jury found that the burden of proof had been met and returned a verdict accordingly.

Judgment affirmed.

Mr. Justice COHEN concurs in the result.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Plaintiff's case is so farfetched and so filled with contradictions by the decedent and conjectures by his doctors, while the testimony of defendant's doctors is so positive and strong, I believe that the verdict was clearly against the weight of the evidence and that a new trial should be granted in the interest of justice.

Mr. Justice JONES joins in this dissenting Opinion.